**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

CHRISTOPHER ROBERTSON,               )
                                     )
      Plaintiff,                  )
                                     )
v                                    )     Cause No. 4:18-cv-01561-JAR
                                     )
CITY OF SAINT LOUIS, MISSOURI, et al.,  )
                                     )
      Defendants.                 )

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
STATEMENT OF UNCONTROVERTED FACTS AND
PLAINTIFF'S ADDITIONAL FACTS**

**Training and evolution of the SLPD's protest response**

1.      There was a CDT team that already existed in 2014, but it was mostly made up of mobile reserve and SWAT officers. (Exhibit F, Rossomanno Depo., 63:22-65:1)

**Response: Admit.**

2.      The SLPD responded to those protests as part of the Unified Command, which included St. Louis County and the Missouri State Highway Patrol (Exhibit C, Templeton Orders)

**Response: Admit.**

3.      On December 11 2014, the Court issued a Temporary Injunction on the City of St. Louis, as part of the Unified Command, relating to the use of chemical munitions in protest response. (Doc. 100, ¶ 30)

**Response: Admit.**

4.      In 2015, the City, as part of the Unified Command, entered into a settlement agreement in that same case. (Exhibit C, Templeton orders, Doc. 100, ¶ 32)

**Response: Admit.**

5.      As part of the settlement agreement, the SLPD added section XIII to its use of force policy.

(Exhibit D. Larson Depo,47:4-19 Exhibit E, Use of Force Police

**Response: Admit.**

7.      After the agreement was entered, Sgt. Rossomanno reviewed the terms of the agreement.

(Exhibit F, Rossomanno Depo., 15:7-22)

**Response: Cannot admit or deny.**

8.      He discovered that the terms agreed to by the parties were already being undertaken by

the SLPD CDT. (Exhibit F, Rossomanno Depo., 15:7-22)

**Response: Denied. The *Templeton* order stemmed from an incident in the City of St. Louis at the intersection of Grand and Arsenal, when the St. Louis Metropolitan Police Department launched chemical weapons at protestors who were inside of a coffee shop. *See* Ex. 1 ¶¶ 36-45[1]; Ex. 2 at 2-3. The entire reason for the change in policy was to stop the SLMPD and Rossomanno's CDT team from punishing protestors with the use of chemical weapons. *Id.* Further, the response does not state when Rossomanno allegedly reviewed the policy and made his faulty "determination." Moreover, as discussed below, the SLMPD and CDT continued to unlawfully use chemical munitions at protests to punish civilians for exercising their first amendment rights. *See* Plaintiff's Statement of Additional Facts ("PSAF") ¶¶ 118-125.**

9.      After the August 2014 Ferguson protests Sgt. Brian Rossomanno and Sgt.  Jemerson were

appointed to coordinate the CDT teams and the training to improve the City's response to civil

---

[1]      This is the Complaint in *Templeton v. Dotson*, No. 4:14-cv-2019 (E.D.Mo.) (D.E. 1). Plaintiff incorporates by reference and requests the Court to take judicial notice of the sworn affidavits and declarations that support these allegations, which were filed as exhibits to the Complaint and are part of the publicly available court file.

disobedience and large scale protests. (Exhibit F. Rossomanno Depo., 31:14-17; 63:24-64:20)

**Response: Cannot admit or deny what the City's intentions for appointing Rossomanno and Jemerson. To the extent this statement asserts that CDT reactions to protests against policy activities "improved," this is denied.** *See* **PSAF ¶¶ 118-125.**

10.     Beginning in the fall of 2014, Sgts. Rossomanno and Jemerson re-wrote the training and practices of the SLPD CDT operations, doing so after researching other departments' training programs. (Exhibit E. Rossomanno Depo., 64:22-65:20)

**Response: Cannot admit or deny. To the extent this statement asserts that CDT reactions to protests against policy activities "improved," this is denied.** *See* **PSAF ¶¶ 118-125.**

11.     They increased the size of the CDT teams to all those who were on patrol in each district. (Exhibit E. Rossomanno Depo.,64:22-65:20).

**Response: Admit.**

12.     All of those officers were required to go through CDT training each year if possible, with a goal of multiple times per year. (Exhibit F, Rossomanno   Depo., (Exhibit F, 65:7-20)

**Response: Denied. Numerous officers testified that they did not receive CDT training prior to the *Stockley* protests, and many could not remember any training in 2017. Ex. 27, Boyher Dep. 84:16–85:1; Ex. 48, Burle Dep. 20:20–22; Ex. 58, Burton Dep. 20:25–21:2; Ex. 59, Carlson Dep. 19:19–20; Ex. 60, Hardin Dep. 14:7–9; Ex. 8, Howard Dep. 122:9; Ex. 28, Rachas Dep. 25:19–21; Ex. 61 Thacker Dep. 62:4–8; Ex. 62, Vanarsdale Dep. 33:4–8. An examination of training records produced in discovery do not include any CTE training until after 2017. No documents have been produced that support the contention that CDT training occurs each year. Moreover, while the goal may have been to do training multiple times per**

**year, the evidence produced by the City demonstrates that officers do not conduct CDT on any regular basis, much less annually.**

13.     The effect and ultimate goal was to ensure that everyone on SLPD was trained in CDT, with very few exceptions. (Exhibit F, Rossomanno Depo., 64:22-65:1)

**Response: Denied. Plaintiff cannot know what the goal was, but the effect certainly was not that everyone on SLPD was trained in CDT.** *See* **Response to SUMF 12. In fact, SLMPD officers testified that they had never received CDT training. Ex. 27, Boyher Dep. 84:16–85:1; Ex. 48, Burle Dep. 20:20–22; Ex. 58, Burton Dep. 20:25–21:2; Ex. 59, Carlson Dep. 19:19–20; Ex. 60, Hardin Dep. 14:7–9; Ex. 8, Howard Dep. 122:9; Ex. 28, Rachas Dep. 25:19–21; Ex. 61 Thacker Dep. 62:4–8; Ex. 62, Vanarsdale Dep. 33:4–8.**

14.     There was also a CDT training held in the summer of 2017 in anticipation of the verdict in the Stockley case. (Exhibit F, Rossomanno Depo., 68-18-23)

**Response: Admit.**

15.     Every officer in the SLPD was sent a copy of the terms of the agreement through its PASS system. (Exhbit , Larson Depo., Exhibit I PASS documents)

**Response: Denied as this a gross distortion as to the validity of the PASS system. First, the Exhibit does not include the underlying document that was shared with the officer. So, Defendants have not identified what the officers saw, and Plaintiff is unable to opine on the sufficiency of the document. Further, the exhibit shows that it was sent to 1,781 officers.** *See* **Ex. I. Of those officers, only 1,086 (61%) certified by signature that they had viewed the copy of the terms.** *Id.* **But a deeper dive shows that this document is merely show. Of the 1,086 officers who certified that they had read and understood the** *Templeton* **settlement, a full 534 (exactly half of the officers who certified that they had in fact read the agreement) lied and**

**never even opened the e-mail.** *Id.* **The best-case scenario for the SLMPD is that 534 of its 1,781, a mere 31%, of its officers actually opened the email and certified that they read and understood it.** *Id.* **But the system does not capture any metrics as to how long the officers spent on the documents, does not include any quiz or questions to ensure that the officers understood the email, and did not include actual training from a person about the agreement.** *Id.* **Notably, of the 13 Defendants, only 2, Aubuchon and Karnowski, viewed the document.** *Id.* **Four Defendants (O'Toole, Bain, Edwards, and Long) incredibly certified that they had read and understood the policy when they had not even viewed the materials.** *Id.* **The prevalence of nearly half of all the officers who certified that they had reviewed the materials when they had not even viewed them is not surprising as they are just following the leading of the Acting Chief.** *Id.* **The other seven Defendants, including the incident commander and the two heads of the CDT, neither viewed nor certified that they had read the materials.** *Id.* **Further, SLMPD could not provide any evidence that it follow ups with the officer who did not certify that they had viewed the materials or lied about the certification even though they never viewed the materials. Exh. 3 (Roth Dep.) 48:9-58:7. This is the smoking gun that shows that SLMPD does not sufficiently train its officer on changes of policies and openly allows its officers to falsify their training records.** *Id.*

16.     When the agreement was finalized, Sgt. Rossomanno reviewed the agreement and the terms that were imposed upon the SLPD. (Exhibit Rossomanno Depo., 15:13-21)

**Response: Cannot admit or deny. To the extent this statement asserts that SLMPD complied with the *Templeton* agreement, this is denied.**

17.     Sgt. Rossomanno discovered that the Templeton settlement required the City to do things in training that he and Sgt. Jemerson had previously implemented. (Exhibit F Rossomanno Depo,

15:7-22)

**Response: Denied.** *See* **Responses to SUMF 12, 13, 16.**

18.    Each month, all officers in the department are required to review the entire Use of Force Special Order and answer random questions through the electronic PASS training system. (Exhibit, Laron Depo 49:12-50:7; Exhibit PASS documents)

**Response: Denied. The officers do not "review the entire Use of Force Special Order," which is 48 pages long.** *See* **Ex. 4. The officers respond to three questions that are virtually always about the use of deadly force.** *See* **Ex. 5, Bartlett Dep. 81:16-82:17.**

19.    Each officer is required to go through 24 hours of continuing training each year to maintain their POST certification. (Exhibit D Larson Depo. 52:19- 53:11).

**Response: Admit.**

20.    Included in every officer's training are defensive tactics, and training on the use of pepper spray. (Exhibit J City Interrogatory Responses)

**Response: Denied. Defendants have not provided details of these trainings to support this claim. Plaintiff concedes that officers are required to go through 24 hours of training. Various officers did not remember when they last received the last time they received training on the use of chemical munitions, so it is impossible that officers are trained on the use of pepper spray at every training. Ex. 18, Bain Dep. 126:15–17; Ex. 27, Boyher Dep. 99:5–8; Ex. 48, Burle Dep. 99:2–7; Ex. 7, Karnowski Dep. 220:16–18.**

21.    As part of their attempts to learn more about large scale protest response,   Sgts. Rossomanno and Jemerson traveled to Cleveland, Ohio to observe their response to the protests at the 2016 Republican National Convention. (Exhibit H Jemerson Depo. 41:12-20)

**Response: Cannot admit or deny. To the extent this statement asserts that SLMPD complied with the *Templeton* agreement or that the CDT response on September 17, 2017, complied with national standards, this is denied. *See* PSAF ¶¶ 118-125.**

22.     At the 2016 RNC, Rossomanno and Jemerson saw for the first time a Bicycle Response Team (BRT). (Exhibit H, Jemerson Depo., 41:17-42:3)

**Response: Cannot admit or deny. To the extent this statement asserts that SLMPD complied with the *Templeton* agreement or that the CDT response on September 17, 2017, complied with national standards, this is denied.**

23.     They contacted Tiger Mountain Tactical to help create and train the BRT for the SLPD. (Exhibit H, Jemerson Depo., 41:21-42:10; Exhibit K Boyher 12/8/20 Depo., 24:14-16).

**Response: Cannot admit or deny. To the extent this statement asserts that SLMPD complied with the *Templeton* agreement or that the CDT response on September 17, 2017, complied with national standards, this is denied. *See* PSAF ¶¶ 118-125.**

24.     The BRT provided a softer approach to protest response. (Exhibit H Jemerson Depo., 43:25-44:2)

**Response: Denied. That is certainly what Jemerson said, but that is not how the BRT operates in practice. On the night of this incident, BRT Sgt. Karnowski initiated the unjustified violence against the protestors when he pepper sprayed a group of individuals who had their hands up, were complying with police directions, were trying to peacefully leave the area, and were trying to find out from the police what was happening. *See* Ex. 6 ("GOPR0019.MP4"); Ex. 7, Karnowski Dep. at 270:16-271:10.**

25.     The BRT was first deployed during the 2016 Presidential Debate at Washington University. (Exhibit M, Karnowski Depo., 30:21-31:22, Exhibit K  Boyher 12/8/20 Depo., 25:6-

18)

**Response: Cannot admit or deny.**

26.     The BRT is not meant for civil disobedience response as it does not have the full protective

gear that the CDT is provided. (Exhibit K, Boyher 12/8/20 Depo.,53:17-54:7).

**Response: Cannot admit or deny. Whether the BRT was meant for civil disobedience**

**response, SLMPD repeatedly deployed BRT during the *Stockley* protests, including during**

**the mass arrest at issue in this case. *See* Responses to SUMF 24 and 31. BRT officers were**

**some of the most aggressive officers repeatedly pepper spraying peaceful citizens. *See***

**Responses to SUMF 24 and 31. *See also Dreith v. City of St. Louis*, No. 4:18CV1565 JCH,**

**2021 WL 4148324, at \*1 (E.D. Mo. Sept. 13, 2021) (denying summary judgment where Lt.**

**Bohyer, the leader of the BRT, pepper sprayed Dreith without probable cause or justification**

**on September 15, 2017).**

27.     Further, as with all the SLPD officers, they must keep up with their continuing education

requirements. (Exhibit D, Larson Depo 52:1-53:6)

**Response: Denied. *See* Response to SUMF No. 20.**

28.     SLMPD has an internal affairs division (IAD) that investigates every complaint made

against its officers. (Exhibit F, Rossomanno Depo., 255:4-23; Exhibit N, Deposition of Daniel

Howard, 20:21-21:23; 33:4-34:6).

**Response: Denied. The City admits that it does not investigate every complaint. The City**

**routinely disregards complaints that it does not deem worth investigating. Ex. 8, Howard**

**Dep. 22:19-24:10. SLMPD Sgt. Bartlett testified that he refuses to take complaints by people**

**who come into his district, even though that is against SLMPD policy, and simply hands**

**complainants the number to Internal Affairs. *See* Exhibit 5 at 96:17-97:20. Further, multiple**

complaints were made to the City regarding the incident at question, and to this day almost

five years later, no investigation has been completed. Ex. 3 at 103:5-104:13; 118:11-121:6;

122:19-25; Ex. 9, Roth Depo. II at 191:11-193:11; 198:20-201:10; 202:11-204:6.

29.     The process has multiple levels of review, including up the SLMPD Inspector and the

Commissioner. (Exhibit N, Howard Depo., 20:21-21:23; 33:4-34:6).

**Response: Denied.** *See* **Response to SUMF 28.**

30.     During the course of discovery, City has produced well over twelve thousand documents

pertaining to 129 IAD investigations from 2012-2017 of various offenses, including excessive

force, unnecessary force, physical abuse, and uncivil treatment. (Exhibit O, Affidavit of Jennifer

Schott).

**Response: Admit.**

31.     Some of those investigations resulted in discipline or dismissal of police officers.  (Exhibit

P, Gilman Depo., 16:7-17:12).

**Response: Admitted, but irrelevant. According to SUMF 30, SLMPD conducted 129**

**investigations over a 6-year period, which calculates to less than 22 per year. In other words,**

**SLMPD would like this Court to believe that a complaint is lodged against an SLMPD officer**

**once every 2.5 weeks. This defies reality. Even if this were true, the facts that "some" resulted**

**in discipline could mean two or three. To the extent that this response implies that SLMPD**

**sufficiently investigates and disciplines its officers, this is denied.**

<u>**Insurance**</u>

32.     The only self-insurance plan that is duly adopted states that the City is only self-insured

as it relates to the claims that are excluded from the sovereign immunity statute (Exhibit Q, City

Ordinance 4.12.030)

**Response: Admit that the ordinance exists. Deny as the City routinely uses their self-insurance plan to pay settlements and rewards as a result of wrongful acts of SLMPD officers, including intentional torts.**

33.     Further, a Missouri state court has ruled that the PFPC is not insurance or a self-insurance plan that waives sovereign immunity. (Exhibit R, Order in *Hendrix v. City*, Case No. 1722-CC01430)).

**Response: Pursuant to Federal Rule of Civil Procedure 56(c)(2), Plaintiff objects that this fact is not capable of being supported by admissible evidence. It is not legally admissible for purposes of a summary judgment motion how another court ruled. It is a legal citation, not a "fact" to be considered. Subject to that objection, Plaintiff admits the fact. However, the Circuit Court was not presented with the extensive new evidence that has been discovered in this and related cases. In fact, the Circuit Court in its decision only mentioned a single letter from the City Counselor. City's Exh. M at 5. Considering the evidence presented below, which was not in front of the Circuit Court, Judge Hamilton denied summary judgment on this issue. *See* D.E. 94 at 16-17, *Dreith v. City of St. Louis, et al.*, No. 4:18-cv-01565-JCH (Sept. 13, 2021). Among the evidence considered by Judge Hamilton was testimony by then City Counselor Michael Garvin, multiple public documents referring to the PFPC as a self-insurance plan, and a detailed history showing that all claims similar to this were paid out of the PFPC insurance fund. *Id.***

34.     The Eastern District of Missouri has upheld that ruling. (Exhibit S, Order in *Hendrix v. City*, Case No. ED108858))

**Response: Pursuant to Federal Rule of Civil Procedure 56(c)(2), Plaintiff objects that this fact is not not capable of being supported by admissible evidence. It is not legally admissible**

for purposes of a summary judgment motion how another court ruled. It is a legal citation, not a "fact" to be considered. Subject to that Plaintiff admits and incorporates Plaintiff's Response to SUMF 33.

### The Stockley Protests

35.     On September 15, 2017, the verdict was released in the case of *State v. Stockley*. (Doc. 100, ¶ 21).

**Response: Admit.**

36.     In response to the verdict, many people began to protest in the City of St.  Louis.   (Doc. 100, ¶ 22)

**Response: Admit.**

37.     Protests that began on September 15, 2017, carried on for more than a month after the verdict was released. (Doc. 37, 26; Exhibit A, Deposition of Steven Schroeder, 37:18-38:1)

**Response: Uncontroverted in part. During September 2017, various people protested at various locations in different manners across the St. Louis region.**

38.     Protests occurred until after midnight on each of the first three days of the Stockley protests, September 15, 16, and 17, 2017. (Ex.  )

**Response: Denied. The protest on September 17, 2017 ended well before midnight.**

39.     Beginning on Friday, September 15, 2017, the Civil Disobedience Teams (CDT) were staged in the Police Academy building on Tucker Street, out of the sight of protestors. (Exhibit B, Transcript of Ahmad Hearing Transcript. Volume II, 148:17-149-16)

**Response: Plaintiff cannot admit or deny this. The CDT team may have been staged on the Police Academy on Tucker Street on September 15, 2017, but the evidence does not support any claim regarding the location of the CDT on September 17, 2027.**

40.     On that day the protests centered on the downtown area, at one point the protests moved to the area around Clark and Tucker. (Ex B., Transcript of Ahmad Hearing, 148:17-149:16)

**Response: Admit, but irrelevant to the September 17, 2017 incident that is the subject of this case.**

41.     At various points, protestors were throwing objects at the buses. (Exhibit B, 149:19-150:11; Exhibit T, Real Time Crime Center Video from 9/15/17, at 1:26:50; 1:28:15

**Response: Admit, but irrelevant to the September 17, 2017 incident that is the subject of this case. Plaintiff also notes that at the video timestamps identified by Defendants above, it appears that a few protestors threw at the buses what appear to be empty water bottles, which bounced harmlessly off the buses. However, the fact that Defendants are highlighting this is illustrative of SLMPD's action on the night in question. SLMPD decided to punish Plaintiff for the actions of other people, on a different day, at a different location.**

42.     At least one of the objects thrown was hard enough to break a window on one of the busses. (Exhibit U, October 16, 2020 Deposition of Gregory Schaffer, 45:17-46:3).

**Response: Denied. Defendants have offered no evidence to corroborate this allegation and no broken window can be seen in the video evidence produced in this case. Additionally, even if Schaffer is to be believed, this event occurred on September 15, 2017, is irrelevant to this case. However, the fact that Defendants are highlighting this is illustrative of SLMPD's action on the night in question. SLMPD decided to punish Plaintiff for the actions of other people, on a different day, at a different location.**

43.     Over the Course of the weekend, several officers were reported as having been injured by items thrown or sprayed on them by protestors. (Exhibit V. Injury Reports; Exhibit F, Brian Rossomanno Depo., 162:11-15)

**Response: Admit but irrelevant to the September 17, 2017 incident that is the subject of this case. The only officer that Defendants have identified as injured on the night of September 17, 2017 was undercover officer Luther Hall, who was beaten so badly by SLMPD officer that his career was ended and the City agreed to pay him $5 million.** *See* **Ex. 10. However, the fact that Defendants are highlighting this is illustrative of SLMPD's action on the night in question. SLMPD decided to punish Plaintiff for the actions of other people, on a different day, at a different location.**

44.     On September 17, 2017, after a peaceful march ended, several protestors ran downtown and caused significant property damage. (Exhibit F, Rossomanno Depo, 170:1-172:16)

**Response: Admit, but clarifies that this occurred at approximately 7:30 pm, four hours before the incident in this case.**

45.     Maj. Howard was directed to send patrol officers to downtown to begin documenting the property damage. (Exhibit. N., Howard Depo., 158:2-159:1)

**Response: Admit.**

46.     Those patrol officers had no protective gear. (Exhibit. N., Howard Depo., 160:5-18)

**Response: Admit.**

47.     After a short period where it seemed as though things would calm down for the night, a group of more belligerent protestors began to engage a unit of the   BRT   near   Tucker   and Locust. (Exhibit W, Tact B Radio channel,3:24:38)

**Response: Denied. The video evidence demonstrates that the persons at Tucker and Locust were not belligerent.** *See* **PSAF ¶¶ 42-59. In a group of about 20-30 people, a young woman is questioning the police with a slightly raised voice.** *Id.* **She is more than ten feet away, is not acting belligerently, or doing anything that is against the law.** *Id.* **In fact, she is wearing tight**

13

clothing, which makes it apparent that she has no weapons on her. ***Id.*** **Defendants' above statement paints this woman as a criminal, which is what they saw her as, because the SLMPD treats the exercise of a citizens' first amendment rights criticizing the police as an affront that requires arrest and the use of force. The other people at that intersection were standing around, barely made a noise, and did not exhibit any belligerence. *Id.***



Screenshot from 0:07 of Ex. 11.

48.     An officer on the ground had put information out over the radio that some protestors were going to attempt to get arrested. (Exhibit W, Tact B Radio channel, 3:31:02)

**Response: Denied. This is a distortion of what was said. An unknown person states on the radio that an unknown "source" is relaying that "they are talking amongst themselves about trying to get arrested." Ex. W, Tact B Radio channel, 3:31:02. Five years later, the City has never identified the source, which person(s) made this statement, how many people "they" are, or where "they" were physically located in relation to Washington and Tucker. There is no evidence whatsoever that this hearsay comment was about Plaintiff or any other individual arrested with Plaintiff. In fact, a review of the evidence shows that neither Plaintiff**

nor any of the other people with him did anything that justified their arrest. Once again, Defendants are grasping at any comments regardless of who made them, when they made them, or where they made them, to justify their retaliatory actions against different people in a different place at a different time, including Plaintiff. It is also unclear which members of SLMPD heard this comment. To the extent that anyone did rely on this vague and ambiguous statement made 45-50 minutes before the mass arrest, this would certainly not be a sufficient basis for probable cause to arrest anyone, much less 100 people.

49.    Sgt. Karnowski, Lt. Boyher and Maj. Howard all went to that location. (Exhibit. N., Howard Depo., 165:15-166:17; Exhibit L, Boyher 10/27/20 Depo, 131:18-132:7; Exhibit M, Karnowski Depo, 138:2-13)

**Response: Admit. According to the cited deposition testimony, "that location" means 11th and Locust.**

50.    When Lt. Boyher arrived, he witnessed dozens of people in front of Sgt. Duke's squad yelling, cursing and shouting threats at the officers. (Exhibit L, Boyher 10/27/20 Depo, 132:12:134:9).

**Response: The video evidence flatly contradicts this claim. *See* Ex. 11; PSAF ¶¶ 42-59. The video evidence taken by Sgt. Karnowski shows that exactly one person was yelling at the BRT officers. *Id.* The other 15-20 people (hardly "dozens") were standing around observing and talking quietly to each other, a considerable distance away from the officers. *Id.***

51.    When Maj. Howard arrived, an item was thrown at him that landed at his feet. (Exhibit N, Howard Depo, 127:2-4).

**Response: Denied. No video evidence has been produced confirming this or what the "object" was. The video evidence that has been produced does not show anyone throwing anything at**

**Maj. Howard or anyone else.  *See* Ex. 11. Regardless, if this did occur, it happened around 10:40 at 11th and Locust. *See* Ex. 11; PSAF ¶¶ 42-59. During the 45 minutes that elapsed between this alleged event and the mass arrest and the excessive force used against innocent citizens, no objects are seen being thrown and no SLMPD officer has even accused Plaintiff or anyone else arrested that evening of engaging in any criminal behavior, violent or otherwise. PSAF ¶¶ 88-99. Maj. Howard testified that during the incident in question, a single bottle was thrown, and it did not strike any officer. Ex. 8 at 126:25-127:6. Sadly, this single water bottle supposedly thrown 45 minutes beforehand is the best justification the SLMPD has come up with for the arrest of over 100 people and the excessive force used that night.**

52.    Lt. Boyher recognized some of the people on Locust to be the same people he saw earlier in the night who were engaging in other criminal activity. (Exhibit L,  Boyher  10/27/20  Depo, 1226:3-12)

**Response: Denied. This is a self-serving statement that has no corroboration. According to the police report, at least 30 persons were arrested as a result of the property damage, including the person that was primarily responsible for the damage. *See* PSAF ¶¶ 37-41. In the five years that have elapsed, the City has never identified a single person arrested during the kettle that was involved in the property damage earlier that evening or was engaged in any illegal activity.**

53.    Col. Leyshock then asked Maj. Howard to call him, by saying on the radio, "Danny call me." (Exhibit G, Leyshock Depo. 180:21-23, Exhibit W., Tact B at 3:28:55)

**Response: Admit.**

54.    Maj. Howard then explained to Col. Leyshock that he did not believe the crowd would

disperse. (Exhibit N, Howard Depo., 172:6-11)

**Response: Admit that may be what Howard told him, though because they avoided using the readily available radio channel, we have no record of their conversation. Deny as to the intention of anybody in the crowd. Defendants do not even attempt to establish what time this statement allegedly occurred. However, given the timeline established in Plaintiff's Statement of Additional Facts, it is likely that this statement, if it actually occurred, was made while Maj. Howard was at 11th and Locust around 10:40 pm. *See* PSAF ¶¶ 42-59. As demonstrated in the various videos, the crowd did follow the instructions of Sgt. Rossomanno and dispersed from Locust and Tucker. *Id.* So even if Maj. Howard believed the crowd would not disperse, the crowd did, in fact, disperse, a fact that Col. Leyshock needed to take into account when deciding whether to arrest everyone at Washington and Tucker 45 minutes later. *Id*.**

55.     Col. Leyshock then requested that the CDT units that had been sent away from downtown to the staging area be returned to downtown so that arrests   could   be   affected.   (Exhibit   X, Leyshock Declaration ¶ 59)

**Response: Admit that almost an hour prior to the arrests, Col. Leyshock decided to arrest everyone downtown, including Plaintiff, even though there was no evidence of criminal activity and no evidence that the people were present earlier in the evening. *See* PSAF ¶¶ 51-53. Col. Leyshock's direction was to arrest everyone without making an individual assessment of probable cause as to whether the arrestee was violating any laws. *Id.***

Col. Leyshock directed Sgt. Rossomanno to deliver orders to disperse and declare   an   unlawful assembly. (Exhibit X, Leyshock Decl. ¶ 56)

**Response: Admit that at Locust and Tucker, at approximately 10:45 pm, Rossomanno gave orders to disperse north on Tucker, and everyone in the vicinity complied with the order, including Plaintiff.** *See* **PSAF ¶¶ 58-59. Despite the compliance with this order and no criminal activity occurring after 8:30 pm that evening, the officers arrested approximately 100 people, including Plaintiff, without probable cause at Washington and Tucker, the location Rossomanno directed people to go.** *Id.*

56.    Exhibit Y is a video that was taken by Mr. Robertson of the incident on September 17, 2017. (Exhibit Z, Robertson Depo., 68:3-14)

**Response: Admit.**

57.    Dispersal orders can be heard at 1:10; 9:52; 10:31; and 11:05 on the video. (Exhibit Y, Robertson Video)

**Response: Admit that at the corner of Locust and Tucker, 35 minutes before Plaintiff was arrested, Plaintiff and others were ordered to disperse from Locust and Tucker and to go north on Tucker, which Plaintiff and the others did.** *See* **PSAF ¶¶ 14-22. Admit that based on the video evidence, the last dispersal order was given at Locust and Tucker, 35 minutes before the arrests were made at Washington and Tucker.** *See* **PSAF ¶¶ 42-59. After Plaintiff and the others complied with the dispersal order, 35 minutes later and without warning, SLMPD arrested Plaintiff and almost 100 other people without probable cause at the location the to which the dispersal order directed them, and then proceeded to beat and douse them with pepper spray.** *Id.*

58.    In addition to the dispersal orders over the loudspeaker, Sgt. Rossomanno and Sgt. Jemerson were on the ground talking to people individually, telling them to leave. (Exhibit F, Rossomanno Depo at 173:16-174:11)

**Response: Admit that at the corner of Locust and Tucker, 40 minutes before Plaintiff was arrested, Rossomanno told an unknown person or persons that they should "get out of here" and that they "have five minutes." Exhibit Y, Robertson video, 2:20. Further admit that those people immediately complied with the request and started leaving the area of Locust and Tucker. *Id.* To the extent that was an order, those persons complied with the order. Forty minutes later and without warning, SLMPD arrested Plaintiff and almost 100 other people without probable cause. Officer Rossomanno giving a couple people a verbal suggestion to leave is not a sufficient basis for probable cause to arrest 100 people 45 minutes later at a different location.**

59.     At least one of those efforts to leave can be heard on Robertson's video. (Exhibit Y, Robertson video, 2:20).

**Response: Admit that at the corner of Locust and Tucker, 40 minutes before Plaintiff was arrested, Rossomanno told an unknown person or persons that they should "get out of here" and that they "have five minutes." Ex. Y, Robertson video, 2:20. Further admit that those people immediately complied with the request and started leaving the area of Locust and Tucker. *Id.* To the extent that was an order, those persons complied with the order. Forty minutes later and without warning, SLMPD arrested Plaintiff and almost 100 other people without probable cause. Officer Rossomanno giving a couple people a verbal suggestion to leave is not a sufficient basis for probable cause to arrest 100 people 45 minutes later at a different location.**

60.     Mr. Robertson did not believe that the warnings applied to him. (Exhibit Z, Robertson Depo., at 90:9-11)

**Response: Denied. Defendants' interpretation of Robertson's testimony is disingenuous. Robertson was referring to a specific dispersal order given at 11th and Locust to the group of persons located there.** *See* **Ex. 12, Robertson Dep. 89:18-92:12. Robertson did not believe that particular order applied to him** *because he was not at 11th and Locust. Id.* **Robertson stated that he believed the dispersal order at 10:33 of the video did apply to him, and he complied with the dispersal order by walking north on Tucker, as instructed by the dispersal order.** *Id.***; Ex. 13 (Robertson Video).**

61.     Prior to moving north on Tucker, Mr. Robertson asked another person for his address, so that if he was arrested, he could tell the cops he lived downtown, even though he did not. (Exhibit Y at 8:10)

**Response: Denied. Robertson testified that this statement was a joke.** *See* **Ex. 12 at 73:23-74:13; 89:9-17. When he was arrested, Robertson gave the police his address.** *See* **Ex. 12 at 89:9-17.**

62.     In the time after he heard the last dispersal order, Mr. Robertson did not attempt to leave the Washington and Tucker area. (Exhibit Y)

**Response: Denied because this is grossly distorting the facts and the contents of the dispersal order. The last dispersal order was given at Locust and Tucker, 35 minutes before the police arrested Robertson.** *See* **PSAF ¶¶ 42-59. Plaintiff and others complied with the order by moving north on Tucker towards Washington, as instructed.** *Id.* **At no time did the SLMPD tell Robertson or other persons to disperse from Washington and Tucker.** *Id.*

63.     Mr. Robertson was then arrested with the others at Washington and Tucker. (Doc. 100)

**Response: Admit.**

64.     Lt. Col. Leyshock only wanted to arrest individuals who did not disperse.  (Exhibit    G,

Leyshock Depo.,138:22-139:8).

**Response: Denied. On the radio call, Leyshock expressly stated that he wanted everyone who was downtown to be arrested.** *See* **PSAF ¶¶ 51-53. He did not give an opportunity for any person at Washington and Tucker to disperse.** *See* **PSAF ¶ 70. To Plaintiff's knowledge, everyone who was told to disperse from Locust and Tucker did so by walking north on Tucker as directed.** *See* **PSAF ¶¶ 14-20, 79; Ex. Y. At no time did anyone order Plaintiff or anyone else to disperse from Washington and Tucker. Lt. Jemerson testified that the method used to arrest Plaintiff and others was not consistent with CDT training.** *See* **PSAF ¶¶ 70, 84.**

65.     Mr. Robertson alleges that the only hands on force that was used against him was that which was necessary to zip-tie him. (Exhibit Z, Robertson Depo.,   51:23-52:9)

**Response: Denied. During Robertson's arrest and even though he was complying with all of their orders, Officers Bain and Edwards used a knee on Robertson's body to restrain him, hold him down, search him, and then zip-tied his hands even though Plaintiff had broken no laws and Bain and Edwards did not have probable cause to seize Plaintiff.** *See* **Ex. 12 at 51:23-52:9; Ex. 18 at 56:3-9. Ex. 17 at 11:26:52-11:31:48. Moreover, it was not necessary to use any force on Robertson, including being zip-tied, because Robertson had broken no laws and complied with all SLMPD orders.** *See* **PSAF ¶ 24.**

66.     Mr. Robertson also alleges that he was hit with some pepper spray. (Exhibit Z, Robertson Depo. 50:4-17)

**Response: Admit. In video produced by Defendants, Lt. Aubuchon can be seen pepper spraying Robertson.** *See* **Ex. 6 at 00:14; Ex. 14, Response to Int. No. 4; Ex. 15 at 13:30.**

## STATEMENT OF ADDITIONAL FACTS

1.      Christopher Robertson is 43 years old and a resident of St. Charles, Missouri. *See* Ex. 16, Response to Int. No. 2.

2.      Robertson is employed as a technical engineer. Ex. 16, Response to Int. No. No. 4.

3.      Before September 15, 2017, Robertson had never attended a police protest. Ex. 12 at 11:8-12:15.

4.      On September 15, 2017, Robertson was having dinner with his wife at Drunken Fish in the Central West End. Ex. 12 at 11:8-12:15.

5.      At that time, Robertson was temporarily living in the City of St. Louis while his St. Charles house was being built. Ex. 12 at 15:11-16:3.

6.      While eating dinner, Robertson had witnessed a peaceful protest. Ex. 12 at 14:11-15:3.

7.      When he returned home from dinner, he checked social media and saw reports of broken windows. Ex. 12 at 15:11-16:3.

8.      He was curious about the change in the protest that he just witnessed, so he went back to the Central West End to observe the protest. Ex. 12 at 15:11-16:3.

9.      On September 16, 2017, he attended another protest to observe, livestream the protest, and take pictures. Ex. 12 at 25:5-15.

10.      Robertson considers himself a neutral observer, not anti-police and not pro-protestor. Ex. 12 at 28:1-7.

11.      On September 17, 2017, Robertson attended a protest at police headquarters. Ex. 12 at 29:17-30:9.

22

12.     After the protest at police headquarters dwindled out, Robertson returned home. Ex. 12 at 33:2-11.

13.     Later that evening, Robertson saw reports of broken windows on Olive and drove back downtown to take document the damage. Ex. 12 at 34:20-35:2.

14.     When he arrived, he saw a line of bicycle officers on Locust and a girl yelling at them. Exhibit 12 at 38:12-39:7. About 15 people stood in the vicinity of the girl. *Id.*

15.     At some point, the police gave a dispersal order to leave Tucker and Locust, and Robertson complied with the order and left the area of Tucker and Locust. Ex. 12 at 39:22-40:20.

16.     All of the people that had been at Tucker and Locust complied with the order by going west on Locust or north on Tucker, as instructed by the police. Ex. 12 at 39:22-40:20.

17.     After that, Robertson saw a lot of people hanging out on the sidewalks and thought it was really uneventful. Ex. 12 at 41:19-24.

18.     Because nothing eventful was happening, Robertson intended to leave but his vehicle was blocked by emergency vehicles stationed on Tucker. Ex. 12 at 45:12-46:6.

19.     Suddenly, lines of police officers appeared from all sides of the intersection. Ex. 12 at 46:9-49:16.

20.     Between the time that Robertson complied with the order to leave Tucker and Locust and the time the police appeared in riot gear, Robertson did not hear any orders to disperse. Ex. 12 at 49:17-23.

21.     Robertson observed many people standing in the doorway of businesses on Washington to let the police lines pass, but the police grabbed them and pushed them towards the intersection of Tucker and Washington. Ex. 12 at 46:9-49:16.

22.     Suddenly, Robertson was hit with pepper spray and ordered to get down on the

ground, which he did. Exhibit 6 at 00:14; Ex. 12 at 49:24-50:5.



Screenshot from Ex. 6 at 00:14. The red circle is Robertson. The arrow is pointing to the pepper spray stream hitting him.

23.     It was later discovered that Lt. Aubuchon pepper sprayed Robertson, even though Robertson did not engage in any criminal activity and was obeying all police orders. *See* Ex. 6 at 00:14; Ex. 14, Response to Int. No. 4; Ex. 15 at 13:30.



Screenshot from Ex. 15 at 13:30. The circle is around the pepper spray. Lt. Aubuchon is currently hidden behind a plant.

24.     Officers Bain and Edwards arrested Plaintiff. *See* Ex. 18, Bain Dep. 56:3-9. Even though he was complying, they used a knee on Robertson's body to restrain him, hold him down, search him, and then zip-tied his hands even though Plaintiff has broken no laws and Bain and Edwards did not have probable cause to seize Plaintiff. *See* Ex. 12 at 51:23-52:9; Ex. 17 at 11:26:52-11:31:48.

25.     Officer Chamblin formally arrested Robertson, even though Robertson had broken no laws and Chamblin did not have probable cause to seize him. Ex. 19, Chamblin Dep.14:3-15:22.

26.     According to Plaintiff's expert, "each individual Police Officer at scene has an obligation to determine if there is Probable Cause to arrest a subject." Ex. 20, DeFoe Report at 41.

27.     Plaintiff's expert further opined that "the crowd as a whole did not constitute an imminent threat to property or property. As such, no general grounds for arrest existed either." Ex. 20 at 34.

28.     Based on his review of the evidence, Plaintiff's expert opined "there was not Reasonable Suspicion to detain or Probable Cause to arrest (anyone including Plaintiff) at/in the area of Washington Avenue and N. Tucker Boulevard, St. Louis MO, 63101." Ex. 20 at 41.

29.     Plaintiff was taken to the Justice Center and detained for at least 12-13 hours. Ex. 12 at 62:12-63:10 .When his bond was paid, Plaintiff remained in detention for an additional five hours. *Id*.

30.     Robertson lost two days of work as a result of being unlawfully arrested. Ex. 12 at

59:18-61:3.

31.     Robertson also suffered emotional distress and damage to his reputation. Ex. 12 at 61:5-63:15.

32.     Since his arrest, Robertson has never been to a protest and never livestreamed on Facebook. Ex. 12 at 61:5-63:15.

33.     There is no evidence that a physical confrontation occurred where Robertson was the aggressor. Ex. 12 at 93:25-94:11; Ex. 13.

34.     There is no evidence of Robertson committing a crime. Ex. 12 at 93:25-94:11; Ex. 13.

35.     There is no evidence that Robertson caused any problems or that Robertson resisted arrest. Ex. 12 at 93:25-94:11; Ex. 13.

36.     There is no such evidence because Robertson did not touch any officers, did not commit a crime, and fully complied with all officer orders. Ex. 12 at 93:25-94:11; Ex. 13.

**Criminal Activity That Occurred Hours Before the Arrest**

37.     At approximately 8:27 pm, some people broke windows at some business on Olive and Washington. Ex. 21 at 137.

38.     The police quickly identified a "main agitator" who was primarily responsible for destroying property. Ex. 21 at 137.

39.     Specifically, the police identified a "black male wearing an orange shirt over his face and wearing khaki shorts." Ex. 21 at 137.

40.     At approximately 9:00 pm, about a half hour after the property damage occurred, this suspect was arrested and transported to the juvenile detention center. Ex. 21 at 53, 138.

41.     In addition, the police arrested approximately 33 other persons who were found in

26

the vicinity of the property damage. Ex. 21 at 138-140.

### Timeline of Dispersal Orders

42.     The police then claim that at 10:40 pm, a "group of 50-100 protestors reconvened at Tucker and Locust and were standing on all corners and in the street. The protestors began to chant and yell at the BRT team that was patrolling the area." *See* Defendants' SUMF 47; Ex. 21 at 141.

43.     The video evidence shows that this is a complete distortion of the truth. *See* Ex. 11.

44.     The video begins at approximately 10:41 pm.[2] *Id*.

45.     Exhibit 11 shows a line of BRT officers striking a line across Locust, east of Tucker. *Id.*

46.     Approximately 20-30 people are in front of the police. *Id.*

47.     One person is using her voice to loudly demonstrate. *Id.* She is not being violent. *Id.* She is not destroying any property. *Id.*

48.     Everyone else is standing around and silent or talking in a calm and quiet manner. *Id.*

49.     The video shows no criminal activity occurring by anyone. *Id.*

50.     At the beginning of the video, you can hear someone on the radio stating "We have a group of protestors at Washington and Tucker and it looks like they are … on the corner and moving eastbound on Washington." *Id.* at 0:04.

51.     Leyshock responds by stating "Tell 8901 and 8374 when I get a CDT team, I will take care of that group. They're going with us. That's enough. Have 'em back off. No more

---

2       At the 4:01 minute mark of Exhibit B, a radio operator states that the time is 2245 or 10:45 pm. Accordingly, the video must have started at approximately 10:41 pm.

discussions. I get a CDT team, they go." *Id.* at 00:19.

52.     Despite receiving no evidence of any criminal activity and the video evidence being bereft of any protest activity, much less violence, at the time, Leyshock made the decision at 10:41 pm to arrest everybody. *Id.*

53.     Based on a review of the evidence, Plaintiff's expert opined that "(n)othing in the BRT video supports the dispersal order." Ex. 20 at 19.

54.     At approximately 10:45 pm, despite no evidence of criminal activity, in the 1100 block of Locust, Sgt. Rossomanno gives a dispersal order stating "This is an unlawful assembly. You must disperse. This is an unlawful assembly. You must disperse." Ex. 11 at 3:30.

55.     About a minute later, Sgt. Rossomanno states "This an unlawful assembly. This is your order to disperse. Anyone who remains is subject to arrest and/or other actions up to and including the deployment of chemical munitions. This is your first order to disperse. You have two minutes to comply. You must leave by walking west on Locust." Ex. 11 at 4:10.

56.     At approximately 10:46 or 10:47 pm, Sgt. Rossomanno gives another order to disperse. "This is an unlawful assembly. This is your second order to disperse. Anyone who remains is subject to arrest and/or other actions up to and including the deployment of chemical munitions. The chemicals, the delivery of chemical munitions, is imminent …. without further order." Ex. 11 at 4:43.

57.     "I am going to continue to give dispersal orders…so they have no excuse." Ex. 11 at 8:30. But the rest of the video evidence and Rossomanno's own testimony establish that he did not actually continue to give dispersal orders. Ex. 22 at 6:15-41:00; Ex. 13 at 15:00-50:00; Ex. 23 ("CITY 000034") at 11:25:00; Ex. 25, *Ahmad* Transcript Vol. II at 200.

58.     At approximately 10:50 pm, Sgt. Rossomanno gives another order. "This is an

unlawful assembly. You are being ordered to disperse from the area of Locust and Tucker by walking either north on Tucker or west on Locust. Anyone who remains in violation of this order is subject to arrest and/or other actions up to and including the deployment of chemical munitions. The deployment of chemical munitions may occur without further warning. This is your third dispersal order." Ex. 11 at 8:38; Ex. 22 ("RebZ Video") at 6:15; Ex. 13 ("Robertson Video") at 15:00.

59.     This 10:50 pm is the last dispersal order made by the SLMPD prior to the arrests, which began at approximately 11:25 pm. Ex. 22 at 6:15-41:00; Ex. 13 at 15:00-50:00; Exhibit 23 ("CITY 000034") at 11:25:00.

60.     The police report falsely states that another dispersal order was given at 11:01 pm. Ex. 21, Police Report at 142. This is contradicted by the video evidence and Rossomanno's testimony in *Ahmad*. Ex. 22 at 6:15-41:00; Ex. 13 at 15:00-50:00; Ex. 23 ("CITY 000034") at 11:25:00; Ex. 25, *Ahmad* Transcript Vol. II at 200. Regardless of the timing of the dispersal orders, they were insufficient with regards to timing, location, and detail.

61.     At approximately 10:55 pm, Leyshock states on the radio: "Everybody that fails to disperse. We are going to be making arrests. They have been warned several times now." Ex. 11 at 9:40.

62.     The police report states that no one was allowed to leave the intersection starting at 11:15 pm, ten minutes before the arrests were being made. Ex. 21, Police Report at 143.

63.     In fact, video evidence depicts the SLMPD Officers grabbing an African-American male who was outside of the kettle and putting him into the kettle. Ex. 22 at 41:06

64.     All the video evidence – from Plaintiff Robertson, Jonathan Ziegler, and videos produced by Defendant – conclusively establish that approximately 35 minutes elapsed between

29

the last dispersal order at Locust and Tucker and the mass arrest at Washington and Tucker. Ex. 11 at 8:38; Ex. 22 at 6:15-41:00; Ex. 13 at 15:00-50:00.

65.     Some of the people at the intersection had been there for some time; others were walking home from restaurants or had just come out of their downtown apartments. Ex. 24, *Ahmad* Transcript Vol. I, Testimony of Iris Nelson at 203-207.

66.     According to Plaintiff's expert's analysis of the evidence, "(m)any of the people who were at Washington Avenue and Tucker Boulevard and were not or never at Locust Street and Tucker Boulevard, may not have heard the Dispersal Order." Ex. 20, DeFoe Report at 20.

67.     Until people were kettled, there was fluid motion on the street of people coming and going. Ex. 17 at 10:45-11:23.

68.     According to Lt. Timothy Sachs, it was approximately 90 minutes after the last Dispersal Order until the people were locked in by 4 police lines. Ex. 25 at 74.

69.     Sachs admitted that SLMPD was allowing ingress at Washington and Tucker. *Id*. at 74, 75, 80. Sachs did not know how far people would have needed to disperse to. *Id.* Sachs did not know if people came into the area after the last announcement was made. *Id.*

70.     Lt. Jemerson, agrees that it is important to give a final dispersal order, especially on the night in question, as there was a high probability of people who were not involved in the initial incident were now at the intersection of Washington and Tucker. Ex. 35, Lt. Jemerson Dep. 10/28/20 at 103:19-104:13, 105:14-106:5, 109:23-111:11. Jemerson agrees that officers have to issue clear and unambiguous warnings that those chemical agents will be used. *Id*.

71.     Officer Gregory Schaffer testified that he does not recall hearing any dispersal orders that night. Ex. 26, Schaffer Dep. at 71:19-24.

72.     Although Boyher testified that he was giving dispersal orders at Ninth and Olive,

which is at least six city blocks from Washington Avenue and Tucker Boulevard, he admitted that did not have a megaphone or anything device that would allow people who were not in his immediate vicinity to hear him. Ex. 27, Sgt. Boyher Dep. in *Rose* 130:9-22.

73.     Officer Samuel Rachas testified that he does not recall the dispersal order giving a clear direction on where to go. Ex. 28, Officer Rachas Dep. 93:19-96:1.

74.     Then St. Louis Mayor According Lyda Krewson testified that while she was watching the events unfold that night from the Real Time Crime Center, she was unable to hear the dispersal orders given. Ex. 29, Mayor Krewson Dep. 158:15-159:3.

75.     Lindsey Laird, who was also arrested that night, testified that she did not hear any dispersal orders at the intersection of Washington Avenue and Tucker Boulevard and was not told by police officers to leave the area. Ex. 30, Laird Dep. 86:19-87:3.

76.     Andre Roberts, who was also arrested that night, testified that he did not hear any dispersal orders given or commands given to leave the area and that chemical munition would be deployed. Ex. 31, Roberts Dep. 97:5-12.

77.     Jonathan Ziegler, who was also arrested that night, testified that he did not hear any dispersal orders given at Tucker Boulevard and Washington Avenue before the arrest. Ex. 32, Ziegler Dep. 114:5-7.

78.     Keith Rose, who was also arrested that night, testified that prior to being "kettled" he was never told to leave. Ex. 24 at 65.

79.     Based on a review of the evidence, Plaintiff's expert opined that "the Defendants failed to provide the Plaintiffs with a sufficient or adequate Dispersal Order and provide the Plaintiffs a reasonable opportunity to comply prior to the unnecessary 'kettling' unnecessary detention(s), unnecessary arrest(s), and unnecessary use(s) of force use at/in the area of

31

Washington Avenue and N. Tucker Boulevard, St. Louis MO, 63101." He further stated that dispersal orders "must be given in a manner reasonably believed to be heard and understood by the intended audience." Finally, he opined that "Defendants failed to properly de-escalate and defuse the situation by simply providing directions to individuals to exit the area (egress) prior to utilizing a 'kettle' to unnecessarily detain the Plaintiffs." Ex. 20 at 46, 49.

80.     Despite being one of the CDT leaders, Lt. Jemerson was not part of the planning for the mass arrest. Ex. 35, Jemerson Dep. 10/28/20 at 64:9-65:5.

81.     Officer James Harris III testified, as did others, that he did not observe any crimes being committed and that he did not have any direct or firsthand knowledge of the people he arrested committing any crimes. Ex. 33, Officer Harris III Dep. 43:5-14.

82.     Sgt. Karnowski testified that he believed that the arrests were rushed. Ex. 7, Karnowski Dep. 281:8-21.

83.     Sgt. Rossomanno testified that he cannot specifically say that he saw any of the people that were arrested in the destruction of property, and that he did not think that arresting the Plaintiffs was an appropriate course of action. Ex. 36, Rossomanno Dep. 10/29/20, 214:1-217:17, 224:21-225:3. Rossomanno testified that if officers pulled out as he wanted it would have de-escalated the situation and people would have been able to leave. *Id.* Rossomanno stated that he put out that information on the radio and advised Lt. Sachs that he did not think the people that remain were the window-breaking, rock throwing-types. *Id.* Rossomanno stated that Lt. Jemerson agreed with him. *Id.* Rossomanno's suggestions were ignored. *Id.* Rossomanno stated that he does not know why Col. Leyschock ignored his suggestions and ordered the mass arrest. *Id.*

84.     Lt. Randy Jemerson testified that the mass arrests in this situation was not consistent with their training. Ex. 37, Jemerson Dep. 9/3/20 at 228:4-9.

85. He further testified that the arrest team that was used in this case was not used in a way that they were trained and that the banging on the grounds by batons should not be continued when the officers are stationary. Ex. 37, Jemerson Dep. 9/3/20 230:24-232:10, 244:25-246:24.

86. Lt. Boyher testified that he was never taught encirclement during his CDT training at the academy. Ex. 27, Boyher Dep. 11/11/20 at 54:20-22.

87. Officer Jeremy Davis testified that he has never heard of or trained in "kettling." Ex. 38, Officer Davis Dep. 68:20-69:1.

88. And there was no justification to detain anyone. Jemerson testified that he has no reason to believe that there was any property damage after 9:30 pm and further stated that after 8:58 pm, there was no more engagement in violence or damage. Ex. 37, Jemerson Dep. 9/3/20 at 215:1-17; 219:22-220:7.

89. Officer Andrew Wismar testified that he did not see any of the people in the kettle, including Plaintiff, involved in physical violence or violence or damage property. Ex. 39, Officer Wismar Dep. 108:23-110:16.

90. Officer Aaron Gaddis testified that he does not recall observing civilians destroying property. Ex. 40, Officer Gaddis Dep. 72:24- 73:3).

91. Maj. Howard testified that he did not see six or more people agreeing to violate laws with force or violence as required to declare an unlawful assembly. Ex. 8, Howard Dep. 193:15-194:2.

92. Sgt. Karnowski testified that he did not see any violent acts by anyone from the time he was at Locust/11th to the time the "kettle" started. Ex. 7, Karnowski Dep. 143:7-19.

93. Karnowski also testified that the arrests were rushed. Ex. 7, Karnowski Dep.

33

281:8-21.

94.    Lt. Sachs testified that there was property damage done after 8:30 pm on the evening. Ex. 41, Sachs Dep. 207:19-208:4; Ex. 25 at 64.

95.    Officer Joshua Witcik testified that he did not see any civilians engaged in any violence that evening and did not witness any people destroying property. Ex. 42, Officer Witcik Dep. 55:22-56:2.

96.    Officer Gregory Schaffer testified that prior to the kettling, he did not observe anyone destroying property or engaged in violence. He further testified that he was not in fear for his safety while he was in the intersection. Ex. 26, Officer Schaffer Dep. 65:18-21, 69:2-24, 116:20-22.

97.    Officer Jeremiah Koerper testified that he did not witness any violent behavior or property destruction from where he was standing, two blocks north of Washington Avenue and Tucker Boulevard. Ex. 43, Officer Koerper Dep. 62:13-23.

98.    Officer Samuel Rachas testified that he did not witness any violent behavior, nor did he witness any criminal behavior outside the failure to disperse. Ex. 28, Officer Rachas Dep. 114:2-115:1.

99.    Almost five years since the events in question, Defendants have yet to produce any evidence that anyone arrested in the kettle was involved in violence or destruction of property. Ex. 20, DeFoe Report at 57.

100.    Even the Defendant's own expert conceded the crowd was not violent, it was not acting with force, and it was not a threat to people or property. Ex. 44, Daigle Dep. 44:24-45:8.

101.    According to SLMPD Sgt. Brian Rossomanno, he agrees that if someone is compliant, it would be inappropriate to use pepper spray. Ex. 25 at 207.

102.    Lt. Jemerson testified, upon reviewing the videos, there was an overuse of handheld mace, the fogger. Ex. 37, Jemerson Dep. 9/3/20 at 188:4-189:4.

103.    At no point did any supervisors or Defendants intervene to protect Plaintiff or the other citizens unlawful arrested and subjected to force. Exs. 6, 11, 15, 17, 22, 23, *generally*.

104.    Based on a review of the evidence, Plaintiff's expert opined that "Defendants did not have <u>Probable Cause</u> to arrest the Plaintiff in this matter" and that "Defendants had a <u>Duty to Intervene</u> if they observed unreasonable force based on the totality of the circumstances. Ex. 20, DeFoe Report at 42, 62 (emphasis in original).

105.    There is no evidence that any officer was investigated or disciplined for these acts. Ex. 3 at 103:5-104:13; 118:11-121:6; 122:19-25; Ex. 9 (Roth Depo. II) at 191:11-193:11; 198:20-201:10; 202:11-204:6.

### Monell – Lack of Investigation and Discipline, Pattern and Practice

106.    An incident cannot be properly investigated if it is not properly documented. Lt. Col. Gerald Leyshock testified that SLMPD had at least 45 minutes to prepare for the mass arrests. Col. Leyshock confirms he did not do anything to ensure that there would be a videographer on the north, south and central side and either did Lt. Sachs. Ex. 45, Lt. Col. Leyshock Dep. 66:20-67:3.

107.    Sgt. Rossomanno testified that he was not sure if all the use of force was in the Incident Report following the kettling. Ex. 36, Rossomanno Dep. 10/29/20 at 241:5-7.

108.    In addition, Rossomanno testified that nobody asked him about the narrative for the police report and nobody asked him what force he observed. Ex. 36, Rossomanno Dep. 10/29/20 at 241:11-22.

109.    Lt. Jemerson testified that the use of force by each officer effectuating arrest was

not documented. Ex. 37, Jemerson Dep. 9/3/20 at 197:11-199:3.

110.    Defendant City has a pattern and custom of SLMPD using excessive force at police protests that it does not investigate. Sgt. [(Ret.)] Heather Taylor ("Sgt. Taylor") is the Senior Adviser to the St. Louis Public Safety Director, who oversees the St. Louis Metropolitan Police Department. Ex. 46, Ret. Taylor Dep. 6:14-21.

111.    Prior to serving in this role, Sgt. Taylor spent nearly 20 years with SLMPD. *Id*. at 91:6-9.

112.    During her last six years on the force, she served as President of the St. Louis Branch of the Ethical Society of Police ("ESOP"), a police union comprised mostly of African-American SLMPD officers. In her roles, she was well versed in SLMPD internal investigations and disciplinary processes. *Id*. at 7:3-5, 112:11-18.

113.    Sgt. Taylor opined that the SLMPD Internal Affairs Division did not properly investigate police misconduct. *Id*. at 10:3-15, 11:14-12:21, 47:19-48:5, 53:5-54:2.

114.    Sgt. Taylor gave a detailed account of the City's pattern and practice of failing to investigate and discipline its officers even when fellow police officers make complaints. *Id*. generally.

115.    Taylor also testified about officer abuse of protestors and described SLMPD officers who tried to speak up about rampant abuse of protestors without success. *Id*. generally.

116.    Sgt. Taylor was also asked "do you have an opinion as to whether there's an "us" versus "them" mentality, when it comes to police response to protests about police behavior?" She responded:

```
4      A. MS. TAYLOR: Yeah. There is a mentality, us
5      versus them.
6      I think the text messages that were discovered
7      for the federal trial for the officers that beat Luther
```

8      Hall, you know -- yeah.
9      There is this mentality. Even in those text
10     messages from Boone to other officers, and the use of
11     the N-word, and you know, we're going to -- you know,
12     they literally talked about beating people up.
13     There is that mentality that's -- unfortunately,
14     that exists. It just does.

*Id*. at 88:23-89:14.

117.    Sgt. Taylor also testified that she had observed livestreams of officers acting inappropriately toward protestors. *Id*. at 54:24-56:5.

118.    On May 19, 2015, in response to protests over the St. Louis Circuit Attorney's office's refusal to charge a SLMPD officer for killing an African American man, SLMPD officers deployed chemical agents against peaceful, non-criminal protestors without warning in violation of *Templeton*. There is no evidence that any officer was investigated or disciplined for these acts. *See* Hahn, Valerie, *Protesters Cited for Noisy Clash with Police Outside St. Louis Prosecutor's Home*, ST. LOUIS POST-DISPATCH, May 20, 2005.

119.    On August 19, 2015, a protest occurred because SLMPD officers killed an African American man in the Fountain Park neighborhood. Ex. 24, Molina Testimony at 50-52.

120.    According to the testimony of Sarah Molina, a local attorney, SLMPD officers indiscriminately used chemical agents without giving an audible and intelligible warning at the intersection of Walton Avenue and Page Boulevard in violation of *Templeton*. *Id*.

121.    Molina testified that SLMPD officers fired chemical agents at her without giving her an opportunity to leave. *Id*.

122.    SLMPD officers continued using chemical agents against people fleeing the area and even fired chemical agents at people peacefully standing on or in their own properties. *Id*.

123.    Thirty minutes after the protests had dissipated, SLMPD officers returned and fired

chemical agents at Ms. Molina, who was standing on property that she owns. There is no evidence that any officer was investigated or disciplined for these acts. *Id*.

124.    On July 21, 2017, SLMPD officers used chemical agents against people protesting the treatment of detainees in the St. Louis City Workhouse. Exh. 24*, Ahmad* Tr. at 71, 91. Although a few people did engage in unlawful activity earlier in the night, SLMPD officers pepper sprayed numerous people, none of whom were involved in criminal activity or were even at the same location as the criminal activity. *Id.* These protesters were engaged in non-violent protesting when SLMPD officers sprayed them with chemical agents. *Id*.

125.    In addition, SLMPD officers used chemical weapons and allegedly used excessive force on September 15, 16, and 17 as detailed in at least 16 different lawsuits in this District.[3] Moreover, on September 22, 2017, prior to this specific incident, the ACLU filed an action seeking injunctive relief regarding the City's use of chemical munitions and violation of the *Templeton* decree during the first weekend of the Stockley protests. *See Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo.)*.*

126.    As to the matter at issue in this case, Lt. Col. Leyshock, after seeing all the uses of force in the police report and the pepper spray, testified that he did not instruct anyone to conduct any sort of investigation into those and to make sure that the uses of force were proper. Not surprisingly, after not ordering an investigation, Leyshock was unaware of anyone being disciplined. Ex. 45, Lt. Col. Leyshock Dep. 211:1-8.

127.    Lt. Jemerson testified that other than the officers indicted in the Luther Hall

---

[3] *Burbridge v. St. Louis*, No. 4:17-cv-02482; *Faulk v. St. Louis*, No. 4:18-cv-00038; *Nelson v. St. Louis*, No. 4:18-cv-01561; *Baude v. St. Louis*, No. 4:18-cv-01564; *Thomas v. St. Louis*, No. 4:18-cv-01566; *Laird v. St. Louis*, No. 4:18-cv-01567; *Rose v. St. Louis*, No. 4:18-cv-01568; *Alston v. St. Louis*, No. 4:18-cv-01569; *Robertson v. St. Louis*, No. 4:18-cv-01570; *Gullet v. St. Louis*, No. 4:18-cv-01571; *Newbold v. St. Louis*, No. 4:18-cv-01572;*Davis v. St. Louis*, No. 4:18-cv-01574; *Ortega v. St. Louis*, No. 4:18-cv-01576; *Ziegler v. St. Louis*, No. 4:18-cv-01577; *Green v. St. Louis*, No. 4:18-cv-01629; *Street v. St. Louis*, No. 4:19-cv-02590.

incident, he is not aware of any SLMPD Officer fired for their actions for the weekend of September 15-17, 2017. Ex. 37, Jemerson Dep. 9/3/20 at 254:14-19.

128.    Based on his review of the evidence, Plaintiff's expert opined "the St. Louis Metropolitan Police Department failed to properly investigate the 'kettling' incident on 9/17/17. It is my opinion that had the SLMPD conducted a proper investigation, they would have determined that there was a failure to effectively de-escalate the situation and that the force used in this matter was inappropriate, unreasonable, and excessive." Ex. 20 at 58.

### *MONELL* – LACK OF TRAINING

129.    Despite its importance, virtually every police officer deposed in this case and the nearly 20 companion cases, from majors to patrolmen, testified that they were not aware of the *Templeton* settlement agreement or the alleged change in chemical munitions policy.

130.    A litany of deposed officers who policed the Stockley protests echoed their lack of having knowledge of the *Templeton* settlement or decree. *See* Ex. 18, Officer Bain Dep. 31:20–22; Ex. 26, Officer Schaffer Dep. 36:12– 17; Ex. 28, Officer Rachas Dep. 45:12–19; Ex. 34, Officer Daut Dep. 70:19–22; Ex. 40, Officer Gaddis Dep. 54:6–11; Ex. 43, Officer Koerper Dep. 24:7–15; Ex. 47, Bayless Dep. 53:11–54:16; Ex. 48, Officer Burle Dep. 98:17–99:1; Ex. 49, Officer Flowers Dep. 76:8–10; Ex. 50, Officer Lee Dep. 47:5–12; Ex. 51, Officer Martorano Dep. 16:7–10; Ex. 52, Officer Schroeder Dep. 16:9–24, 18:10–12; Ex. 53, Officer Khan Dep. 14:19–21, 15:6–24; Ex. 54, Sgt. Marks Dep. 31:1–5; 38:19–22.

131.    This same lack of knowledge permeated the highest ranks of the police department. When asked about the *Templeton* settlement or decree, Maj. Howard, one of the highest- ranking supervisors in the Department and. Defendant in this case, answered as follows:

Q    Have you ever heard of a case called *Templeton v. Dotson*?
A    Say it again.

> Q        Have you heard of a case called *Templeton v. Dotson*?
> A        No.
> Q        Are you aware that SLMPD entered into a settlement agreement in that case?
> A        No.

Ex. 8, Maj. Howard Dep. 141:16–24.

132.    Even the supervisors on the line were similarly unaware of the *Templeton* settlement or decree. Ex. 55, Lt. Aubuchon Dep. 114:25–115:8; Ex. 56, Sgt. Re Dep. 99:14–100:5.

133.    Even Lt. Timothy Sachs ("Lt. Sachs"), who was second in command of SLMPD's response to the Stockley verdict and who reported directly to Lt. Col. Leyshock, the incident commander, was similarly bereft of any knowledge about the *Templeton* settlement or decree at the time of Plaintiff's assault:

> Q        Do you remember the – are you familiar with the *Templeton* decision?
> A        I am not.
> Q        Okay. Are you aware that the City and the police department entered into a consent judgment regarding the use of chemical munitions?
> A        I was – I was made aware of it at some point, but I don't remember when.
> Q        Could it have been after Sept. 17, 2017?
> A        It could have been, yes.

Ex. 41, Lt. Sachs Dep. 258:14–23.

134.    These same officers and supervisors could not remember being retrained on SLMPD's changes to its chemical munitions policy in light of *Templeton*, nor could they articulate any such changes prior to Plaintiff's assault. *See* Ex. 18, Officer Bain Dep. 31:23–32:1; Ex. 26, Officer Schaffer Dep. 36:18– 23; Ex. 34, Officer Daut Dep. 70:23–71:5; Ex. 38, Officer Rachas Dep. 45:20–46:2; Ex. 40, Officer Gaddis Dep. 55:23–56:2; Ex. 43, Officer Koerper Dep. 24:7–24;Ex. 47, Officer Bayless Dep. 53:11–54:16; Ex. 48, Officer Burle Dep. 99:2–100:4; Ex. 49, Officer Flowers Dep. 76:11–24; Ex. 50, Officer Lee Dep. 47:13–16; Ex. 52, Officer Schroeder Dep. 16:20–17:22; Ex. 53, Officer Khan Dep. 14:19–21, 15:6–24; Ex. 54, Sgt. Marks Dep. 32:4–14, 38:19–22.

135.    Once again, the testimony of Maj. Howard is telling:

16 Q At any point in 2014, were you informed that
1  there was a change to SLMPD policy regarding chemical
2  munitions?
3  A I don't remember the specifics. I don't
4  remember the specifics.
5  Q But you were informed that there was a
6  change?
7  A There was -- there was something that I
8  remember that came down and I do not remember the
9  specifics.
10 Q When you say something came down, what do
11 you mean?
12 A Well, I thought there was a ruling and was
13 there Judge Jackson? I don't know. I shouldn't – I
14 shouldn't unless I recall. But I -- I remember there
15 was something about mace. I don't remember what it
16 was.
17 Q Were you ever retrained in 2014 regarding
18 mace or pepper spray?
19 A I was not.
20 Q Were you asked to review anything regarding
21 mace or pepper spray in 2014?
22 A I don't recall.
23 Q Were you asked to talk to your subordinates
24 about chemical agents such as mace or pepper spray in
25 2014?
1  A I don't recall that. And it would have been
2  my captains anyway.
3  Q After 2014, do you recall receiving any
4  training regarding pepper spray or mace?
5  A I do not.
6  Q After 2014, do you recall being informed of
7  any changes to policy regarding pepper spray or mace?
8  A I don't remember specifically.
9  Q After 2014, did you ever advise your
10 subordinates of any changes to policy regarding pepper
11 spray or mace?
12 A I don't recall.

Ex. 8, Maj. Howard Dep. 141:25–143:12.

136.    Sadly, Lt. Sachs, a Defendant in this case, was equally ignorant of any such policy

changes or trainings before Plaintiff was assaulted:

41

14  Q And did you ever receive any specific
15  training regarding the terms of the *Templeton*
1   agreement?
2   A I did not.
3   And did you receive any training regarding
4   any changes in department policy regarding use of
5   chemical munitions as a result of the *Templeton*
6   agreement?
7   A I did not.
8   Q And did you provide any training to your
9   subordinates regarding the same?
10  A No.
11  Q All right. Do -- do you know if the CDT was
12  trained in the terms of the *Templeton* agreement?
13  A I believe, yes, because I -- I believe
14  That's where I heard the initial -- the name of the
15  decision.
16  Q Okay. And what do you remember about that
17  training?
18  A Next to nothing other than that terminology
19  was used.
20  Q And do you -- do you -- do you know what
21  changes in St. Louis Police Department procedures
22  regarding chemical munitions happened as a result of
23  *Templeton*?
24  A I do not.
25  Q And do you remember any training regarding
1   the changes in chemical munition policy as a result of
2   *Templeton -- Templeton* decision?
3   A No.

*See* Ex. 41, Lt. Sachs Dep. 258:24–260:3.

137.    And Lt. Boyher testified he was never taught encirclement (a more innocuous term

for "kettling") during CDT training at the academy. Ex. 27, Boyher Deposition in *Rose* 54:20-22.

138.    Officer Andrew Wismar testified that he has no recollection of being trained on

how to properly disperse a crowd. Ex. 39, Officer Wismar Dep. 115:8-11.

139.    Officer Aaron Gaddis testified that he does not know when an officer is permitted

to use chemical agent such as pepper spray or mace. Ex. 40, Officer Gaddis Dep. 54:12-22.

140.    Officer Gregory Schaffer testified that he is unsure if the use of some of the pepper

spray violates the SLMPD Use of Force policy. Ex. 26, Officer Schaffer Dep. 113:17-22

141.    Based on his review of the evidence, Plaintiff's expert opined that "there was a failure by the St. Louis Metropolitan Police Department failed to properly train the Defendant Officers on following subject matters: Verbal Strategies, Active Listening Skills, Defusing and De-Escalation Techniques, Supervisory Command and Control, Crowd Management, Crowd Control, Dispersal Orders, Situational Awareness, Ingress/Egress, Duty to Intervene/Intercede, and use of Less Lethal Force." Ex. 20, DeFoe Report at 58.

142.    Plaintiff's expert further elaborate that it was his opinion that "Defendants <u>failed</u> to establish policies and procedures designed for effective response by the St. Louis Metropolitan Police Department (SLMPD) to crowd management events prior to 9/17/2017" and "failed to develop Crowd Behavior, Crowd Management, Intervention, and Control Strategies designed for an effective response by the St. Louis Metropolitan Police Department (SLMPD) to crowd management events prior to 9/17/2017 at/in the area of Washington Avenue and N. Tucker Boulevard, St. Louis MO, 63101." Ex. 20, DeFoe Report at 34, 36. (Emphasis in original)

143.    Finally based on a review of the evidence, Plaintiff's expert opined "Defendants were not properly trained in law enforcements objectives to provide for the legal protection of the Constitutional rights of all persons, prior to 9/17/2017, when they responded, deployed, and took unnecessary action to include the unnecessary 'kettling' unnecessary detention(s), unnecessary arrest(s) and unnecessary use(s) of force of the Plaintiffs." Ex. 20, DeFoe Report at 41.

## RETALIATION

144.    Officers have testified that there was no violence on September 17, 2017, by any of the people arrested in the kettle. For example, Lt. Jemerson testified that his observation was that aside from one or two people, everyone started putting their hands up and either were getting on

their knees or getting on the ground at the time of the kettle. Ex. 37, Jemerson Dep. 9/3/20 at 188:15-189:4

145.   Patrick Mobley testified that while filming, a police officer in a white shirt and riot helmet approached him and quickly grabbed his phone without warning and handed it to a plain clothes officer wearing jeans and a polo shirt. When Mobley got his phone back, his video was erased. Ex. 24, Mobley Testimony at 163-164.

146.   Fareed Alston testified that an officer removed his camera from around his neck by grabbing his hair and stated, "this is what you get, you want to record the police." Ex. 57, Alston Dep. 66:21-67:4.

147.   Joshua Torrez Wedding testified that he was pepper sprayed in the face, that he was not given any warnings before he was pepper sprayed, and that he was videotaping officers immediately before force was used against him. Ex. 24, Torrez Wedding Testimony at 241.

148.   These actions did not occur randomly. Text messages sent amongst officers who participated in the kettling made clear that the SLMPD was aware and planning for this event. The text messages were released in the indictment of several officers who beat SLMPD undercover officer Luther Hall so badly earlier in the evening of the incident at question that they ended his career. Ex. 63, Luther Hall Indictment.

149.   The plan was that people were getting kettled, pepper sprayed and arrested, whether they were breaking the law or not.  The indictment quoted text messages sent to and from the defendant officers regarding the mass arrest on September 17, 2017, that prove the vicious and unlawful intent of the officers and belie any post hoc justification for the kettling, use of chemical agents, excessive force, and arrests:

- "The more the merrier!!! It's gonna get IGNORANT tonight!! But it's gonna be a

44

of lot of fun beating the hell out of these shitheads once the sun goes down and nobody can tell us apart!!!!" *Id*. at 2-4.

- "R u guys in [South Patrol Division] prepping anything for the war tonight?"

- "We reloading these fools up on prisoner busses. As they got on we all said in unison 'OUR STREETS' haha." *Id*. at 2-4.

- "Yeah. A lot of cops gettin hurt, but it's still a blast beating people that deserve it. And I'm not one of the people hurt, so I'm still enjoying each night." *Id*. at 2-4.

- "The problem is when they start acting like fools, we start beating the shit out of everyone on the street after we give two warnings." *Id*. at 2-4.

- "I'm on (Sgt **'s) arrest team! Me and a BIG OL black dude r the guys that are hands on! No stick or shield… just (expletive) people up when they don't act right! …" *Id*. at 2-4.

150.   In this case, Plaintiff has evidence that chemical munitions were used without warning on Plaintiff and those around him. Rossomanno testified that he does not know if the SLMPD Officers that deployed chemical munitions warned the subjects that they were spraying. Ex. 36, Rossomanno Dep. 10/29/20 at 268:5-17.

151.   Lindsey Laird testified that she did not hear any warnings that chemical munitions were going to be deployed. Ex. 30, Laird Dep. 86:19-87:3.

152.   Keith Rose testified that he did not hear any announcements before he was pepper sprayed. Rose was sprayed as he was told to get on the ground, was sprayed when he was on the ground, and was sprayed after he was zip tied. Ex. 24, Rose Testimony at 67-68.

153.   Demetrius Thomas, who was also arrested that night, testified that he was maced from a few inches away even though he was complying with all commands. Thomas was pushed

to the ground. An officer took and damaged his camera. Thomas did not hear a single warning when he was there. Ex. 24, Thomas Testimony at 150, 151 and 158.

154.    Dillon Newbold, who was also arrested that night, testified that an officer approached him and sprayed mace in his face without warning. An officer pulled his goggles and bandana off and sprayed him in the face with pepper spray. Newbold was zip tied and his hands remained zip tied for 1.5 hours. Ex. 24, Newbold Testimony at 176-178.

155.    Tony Rice, who was also arrested that night, testified that an officer slapped the phone out of his hand. Rice was hit with chemical munition. Rice stated that he was not committing a crime and did not fail to comply with commands. Rice did not see any property damage or violent acts. Ex. 24, Rice Testimony at 191, 192, 199.

156.    Iris Nelson, who was also arrested that night, testified that she and her husband were subjected to pepper spray. Nelson observed her husband being dragged by four police officers who were kicking him and shoving his face into the ground. She also observed her husband being pepper sprayed after he was zip cuffed. Ex. 24, Iris Nelson Testimony at 209-210.

157.    Alex Nelson, who was also arrested that night, testified that a police officer approached him, pulled his head back, and sprayed him in the eyes. Nelson was dragged across the concrete on his forehead, shoulder, and knee. Prior to be dragged he was ziptied tightly. An officer used a knee on his body to hold Nelson down. An officer approached him and stated, "do you like that cock sucker." Nelson was never told to go home. Nelson did not see a single person resisting arrest. Nelson was not breaking any laws. Ex. 24, Alex Nelson Testimony at 224-227, 233.

158.    Jonathan Ziegler, who was also arrested that night, testified that while on the ground he was pepper sprayed. There was no communication or warnings from the police at all. Ziegler

was shot with pepper spray about six times. Ziegler saw at least three officers use the big blue cans of mace, Ex. 24, Ziegler Testimony at 256-258.

159.   Based on a review of the evidence, Plaintiff's expert opined that "the Defendants failed to give (Plaintiff), a verbal warning and a reasonable opportunity to comply prior to using any force in this matter." Ex. 20, DeFoe Report at 50.

160.   These munitions were used on a crowd who was compliant, on the ground, many of whom were ziptied at the time of being pepper sprayed. And whether it was one spray or not, the reality is that the use of the chemical munitions was merely to scare and punish protestors. Exs. 6, 11, 15, 17, 22, 23, *generally*.

161.   Based on a review of the evidence, Plaintiff's expert opined "Defendants used unreasonable, inappropriate, and unreasonable force on" Plaintiff. Plaintiff's expert further opined that use of chemical agent was in violation of Metropolitan Police Department- City of St. Louis, Office of the Chief of Police, SO1-01, DEPLOYMENT OF CHEMICAL AGENTS FOR CROWD DISPERSAL, issued July 10, 2015, (DEFS. 015903-015904) and the *Templeton* Agreement. Ex. 20, DeFoe Report at 51.

162.   Even the use of the kettle was under warranted. Sgt. Karnowski testified that they have never been trained to "kettle." Ex. 7, Karnowski Dep. 96:5-24.

163.   It is undisputed that officers took selfies while arresting protestors, and took a photograph of taking back Washington Avenue, which was posted online afterwards. Former Officer Patrick Daut testified that he was completely and utterly disgusted that the officers were heard chanting, "Whose streets" Our streets," and he had no part of it. Ex. 34, Officer Daut Dep. 177:13-17.

164.   After midnight, the then acting chief of police for SLMPD, endorsed the SLMPD's

actions and said, "I'm proud to say the City of St. Louis and the Police owned the night." At the time of this statement, he was standing side by side with Mayor Lyda Krewson. Moore, Doug. *Krewson Calls Interim Police Chief's Protest Remarks 'Inflammatory' But Stands By Him*. ST. LOUIS POST-DISPATCH. Sep. 20, 2017.


Date: September 12, 2022

Respectfully submitted,

KHAZAELI WYRSCH LLC

<u>/s/ Javad M. Khazaeli</u>
Javad M. Khazaeli, 53735MO
James R. Wyrsch, 53197MO
911 Washington Avenue, Suite 211
St. Louis, MO 63101
(314) 288-0777
(314) 400-7701 (fax)
james.wyrsch@kwlawstl.com
javad.khazaeli@kwlawstl.com

CAMPBELL LAW LLC

Alicia Campbell, 59586MO
John Campbell, 59318MO
3470 S. Jefferson
St. Louis, Missouri 63114
alicia@campbelllawllc.com
john@campbelllawllc.com

*Attorneys for Plaintiff*